HEARD APRIL TERM, 1879.

CASE No. 762.

THE STATE OF SOUTH CAROLINA, BY THE ATTORNEY-GEN-
ERAL, *EX RELATIONE* W. R. CATHCART ET AL., v. THE
CITY OF COLUMBIA ET AL.

1. The failure of a Circuit judge to state his findings of fact and conclusions
   of law separately, is not error in the judgment, which may be remedied
   by appeal.
2. Bonds of a municipal corporation, issued with intent to retire, by means
   of their proceeds, outstanding bonds of a previous issue, having accom-
   plished such purpose, will be held valid in equity, although the statute
   under whose authority they were issued contained the proviso "that be-
   fore such issue the city council shall recall and cancel" the bonds so
   outstanding. HASKELL, A. J., *dissenting.*
3. Bonds of a municipal corporation issued under the authority of an act of
   the legislature, which provided "that no bond shall be negotiated under
   the provisions of this act otherwise than by public sale, notice of which,"
   &c., and endorsed with a recital that the provisions of the act in this
   particular had been complied with, held to be valid obligations of the
   city, although sold on a day to which the sale had been adjourned from
   the day of which proper advertisement had been given, and bid in by
   members of the city council at a price less than a limit fixed by council,
   and subsequently resold privately at an enhanced price for the benefit of
   the city. HASKELL, A. J., *dissented* as to those bonds which were pri-
   vately negotiated for purposes, in his judgment, *ultra* the objects author-
   ized.
4. The city of Columbia directed her mayor to borrow money to carry on
   the construction of a city hall and market, and for other purposes neces-
   sary for the support of the city government. A loan was effected for
   $75,000, secured by an issue of $250,000 in bonds, dated August 21st,
   1871, deposited as collateral security. Subsequently the legislature
   passed an act authorizing the city to issue bonds, with a proviso "that
   before such issue the city council shall recall and cancel the bonds to the
   amount of $250,000, issued August 21st, 1871, for the erection of city hall
   and market," and with a further provision that the proceeds of the sale
   of such new bonds should be applied "first to the payment of any debts
   heretofore contracted for the construction of the new city hall and the
   new market," &c. *Held,* that the act recognized the $75,000 loan as
   having been made for the city hall and market, and authorized its pay-
   ment, and the council were not limited to the payment of only so much
   of such loan as was actually so expended. HASKELL, A. J., *dissenting.*

5. In the absence of proof that the proceeds of the bonds were expended for purposes other than such as constituted proper municipal objects, it cannot be held that there was a violation of the sixth section of the act which required such proceeds to be applied " first to the payment of any debts heretofore contracted, or which may hereafter be contracted for the construction of the new city hall and the new market ; and, secondly, for the improvement of the streets, the extension of the water works, and for any other improvements which shall be adjudged advisable by the said mayor and aldermen." HASKELL, A. J., *dissenting.*

6. Expenditures for purposes other than the construction of the city hall and market, before the completion of such buildings, were not unauthorized by this act. HASKELL, A. J., *dissenting.*

7. A finding of fact by the Circuit Court against the appellants, upon whom lay the burden of proof, sustained, there being no overbearing testimony to the contrary.

8. Section 8 of the act required " that said mayor and aldermen shall cause the provisions of this act, or an accurate abstract thereof, to be printed on the back of each bond." What purported to be an abstract of the act was printed on the back of the new bonds, but it omitted to state that the act required the old bonds to be canceled before the new could be lawfully issued. *Held,* that the bonds were valid obligations of the city.

9. A municipal corporation having borrowed money and delivered its bonds in payment therefor, neither the corporation, nor any one in its behalf can recover such bonds, upon the ground that it was not authorized to create such debt. HASKELL, A. J., *dissenting.*

10. There can be no judgment against defendants failing to answer where the principal matter of the bill put in issue by other defendants, fails for want of proof; but other matters not necessarily connected with the principal matter, alleged against one only of the defendants, who did not appear to the action, will be taken as true, and judgment entered thereon against him.

11. The character and nature of the powers, duties and restrictions imposed upon the city of Columbia by the several provisions above recited of the act authorizing an issue of bonds, discussed by WILLARD, C. J., and HASKELL, A. J.

Before PRESSLEY, J., Richland, November, 1878.

The nature of this action and the terms of the act of March 13th, 1872, (15 *Stat.* 220,) construed by the court, are sufficiently stated in the opinion of the Chief Justice. The facts connected with the loan of $75,000 by J. L. Neagle, which preceded the passage of this act, are set forth in the Circuit decree.

John Alexander was mayor of Columbia from April, 1870, to April, 1874. Holders of bonds issued under the authority

of the act of March 13th, 1872, were parties defendant to this cause. The bonds issued under this act are called city hall bonds. They were first put up for sale at auction in the city of Columbia on June 19th, 1872, all the advertisements required by the act having been duly made. At this sale $100,000 in bonds were sold, of which C. Waring bought $10,000 in bonds, and he paid for them in claims then held against the city for work upon the city hall, and the remaining $90,000 were bid in by John Alexander for the city, under instructions from the city council not to let them go for less than a limit which exceeded the sum bid. It was then announced that the sale was adjourned to October 2d, 1872. The second sale was advertised in the Columbia and Augusta, and possibly the Charleston papers. At the second sale $50,000 in bonds were sold, some of which were bid in by third parties, and the remainder were bid in for the city. One of the purchasers at this sale was the Central National Bank, which held a note of the city for money borrowed in June, 1872, and the price of the bonds was applied in payment of this note. Public notice was then and there given that the sale was adjourned over to December 2d, 1872. The third sale was advertised to the same extent as was the second. At the third sale $100,000 in bonds were sold and were all bid in for the city.

The bonds bid in by the city were disposed of afterwards by the corporate authorities by private negotiation. Some were sold directly to purchasers, others were deposited as collateral security to secure loans made by the city, and on default of payment, some of them were placed on market and sold. Of the bonds bid in by Alexander, he retained $750 for a debt due to himself by the city. Alexander, and other defendants who were holders of city hall bonds, did not answer in this action.

This statement, together with the Circuit decree, the grounds of appeal, the opinion of the court and the dissenting opinion, fully presents the case.

The Circuit decree is as follows:

The city of Columbia is oppressed with a heavy burden of debt, and the relators seek in this case to relieve her from a por-

tion thereof. They allege that her bonds, amounting to $250,-000, issued by authority of the act of March, 1872, are void and should be canceled. In the issue of said bonds important provisions of the said act were disregarded, as following, to wit:

*First.* That before such issue certain other bonds previously issued were not recalled and canceled, as required by the first section of said act.

*Second.* That the bonds issued under the act were not advertised and negotiated "by public sale," as its third section required.

*Third.* That, contrary to the sixth section of said act, much of the proceeds of said bonds was wastefully and fraudulently used for the current expenses of said city.

*Fourth.* That "an accurate abstract" of the said act was not, as required by its eighth section, printed on the back of the said bonds.

The first of the said allegations has reference to a fraudulent contract, which, before the passage of the said act, had been made between J. M. Allen and the city council of Columbia for building a new city hall. After that contract had been executed, the city council, under pretence of raising money for that purpose, borrowed from J. L. Neagle the sum of $75,000, and, as security for the same, pledged to him its bonds, amounting to $250,000. These bonds so pledged were, by the said act of March, 1872, to be recalled and canceled before the issue of the new bonds therein authorized, and this requirement was not performed according to its letter. The new bonds were issued and sold at public sale on June 19th, October 2d and December 2d, 1872, but the old bonds were not in possession of the city council until November 28th, and were not canceled in fact until December 8th, 1872. If, therefore, the first section of the said act be construed *literally*, its mandate was not complied with in the said issue.

But previous to the said issue, very soon after the passage of the act, the city council had borrowed money from R. K. Scott and the Carolina National Bank, and had paid to J. L. Neagle the debt for which the old bonds were pledged. All that time the understanding with R. K. Scott and the bank was that these

pledged bonds should remain as security for the new loan until bonds of the new issue could be prepared to replace them. Under this agreement the old bonds were subsequently redeemed and canceled on December 8th, 1872.

I hold that the said arrangement and its completion was a substantial compliance with the said act; the first and sixth sections must be construed together and so as not to contradict each other. If they be construed separately and literally, then the first section would require that the old bonds be canceled before the new be issued, whilst the sixth section would require a sale of new bonds in order that the proceeds might redeem the old bonds by paying the debt for which they stood pledged. Here, then, by construing the two sections separately, according to their letter, would be two priorities, each demanding precedence of the other, and that would be impossible. I therefore find it necessary to harmonize them by looking to the spirit and purpose of the act, and there its meaning seems to be that, before the new bonds be issued, some certain and positive arrangement was to be effected whereby to recall and cancel the old bonds, and so make it certain that the city should not, in any case, be liable at the same time for both issues. That arrangement having been made and successfully completed, it accomplished the full purpose of both sections of the act; it paid the debt previously contracted for the said city hall, as required by the sixth section of the act, and canceled the pledged bonds, as required by the first section. When that was done, the whole transaction, "*nunc pro tunc*," assumed the date of the contract which accomplished it, and the intent and spirit of the act was complied with.

2. As to the requirement that the said bonds should be negotiated only by "public sale," that, also, seems to me to have been substantially complied with. They were duly offered at public sale, but, to prevent needless and ruinous sacrifice, a limit as to the price they must sell for was fixed by the city council, and such bonds as were not bid for at that price were bid in by the mayor of the city, who afterwards, for its benefit, sold them at private sale. The testimony herein proves this to have been a wise plan; it most certainly obtained a higher price for the said bonds than unlimited public sale would have reached. It is,

therefore, the case of an agent authorized and directed to sell only at public sale who voluntarily incurs personal risk by bidding in the property so sold. If he afterwards sell it at a less price, he himself must pay the loss; but if he make profit by such subsequent sale and allow the benefit thereof to his principal, his conduct in that respect will not be unlawful or invalid, and a principal could rarely be found who would refuse to ratify such act of his agent.

But even if the sale of the said bonds were not according to the requirements of the said act, it could not now be impeached; its performance was entrusted to the city council, which, by its recital on the said bonds, states that they were issued by a "public sale thereof," and that recital is, under the law, a sufficient protection to any purchaser for value.

3. As to the allegation that the proceeds of the said bonds, contrary to the sixth section of the act, were applied to the current expenses of the city, it is not, to any material extent, sustained by the testimony offered in this case. Previous to the passage of the act the $75,000 which had been borrowed, under pretence of building therewith the city hall, had been recklessly squandered; only $12,000 of it can be pretended to have been paid on account of the said building, and yet not so much as $2000 of it remained in the city treasury when the act was passed. But that wasteful expenditure was cured by the act. Its sixth section expressly directs that debt to be paid out of the proceeds of the bonds therein authorized. The provision of that section cannot be supposed to refer to any debt other than the $75,000 due to Neagle, because the city had not, up to that time, contracted any other debt which could be designated as one "heretofore contracted for the construction of the new city hall and the new market." It is manifest, therefore, that though the $75,000 had been previously squandered, yet the lender was to be paid first out of the proceeds of the bonds which the act authorized. To pay that and the interest thereon required nearly $80,000. The sale of the said bonds produced only $148,364, thus leaving less than $70,000 for the construction of the new city hall and the new market, and the improvement of the streets, the exten-

sion of the water works, "*and any other improvements judged advisable by the said mayor and aldermen.*"

Under these unlimited powers the most active schemer in that body could scarcely have devised any plan for spending that balance which would not have been within the vast scope of the said act. But whatever might have been the result of such effort, it is certain that the trial was not made. The testimony herein shows conclusively that more than the said balance was applied to the *special* purposes of the act. And the fact that certain debts due for current expenses were paid out of the proceeds of said bonds does not falsify this conclusion, inasmuch as the accounts show that these payments, thus temporarily taken from the construction fund, were afterwards restored to it, when needed, from other resources of the city treasury.

But if that had not been done, and if part of the said $70,000 had been fraudulently misapplied, that would not have rendered the bonds invalid. They are negotiable securities, and purchasers thereof, even suspecting that the proceeds are to be misapplied, are not bound to inquire of that matter. No mere suspicious circumstances or negligence of the purchaser, nothing but bad faith in him, will impair his title, and I do not find in this case any proof of such bad faith.

*Lastly.* The remaining allegation of the relators refers to the printed abstract of the act which was placed on the said bonds. They say that it omits the condition precedent of the first section of the act, which required the old bonds to be canceled before the new could be lawfully issued. But the act entrusted that duty to the mayor and aldermen, and made no provision for the correction of such abstract as they might prepare. They, therefore, were the sole judges of its sufficiency, and their recital on the bonds that the said abstract was in compliance with the act is a complete protection to the bondholders.

I have reached the above conclusions most reluctantly. The act was drawn with consummate skill, so as to inspire the utmost confidence of purchasers, and it seemed to contain every provision necessary for the protection of the said city, yet in its sixth section it adroitly inserts the provision which its framer intended for his own benefit. By that he has recovered the $75,000

which he had lent the city for wasteful and fraudulent purposes. It is very manifest that the whole city hall scheme originated in fraud and bribery. The said loan was only an ill-disguised bribe to purchase for the lender an exorbitant contract. Public clamor compelled him to surrender it, and then he devised the said act, whereby he regained the money he had lent, and retained, besides, $12,000 paid him in advance for work to be done, but not done—except to the extent of the value of $7,000. I cannot reach him by any proper decree in this case. My inclination in every case would be to inflict loss upon all who, knowingly, to the loss of the public, lend their money for wasteful purposes to reckless and dishonest rulers. But the law limits my authority, and the sixth section of the said act effectually protects those who lent their money to pay that debt, which it directed to be paid.

It is therefore adjudged and decreed that the relators be denied the relief which they seek, and that their complaint be dismissed, without costs.

From this decree the plaintiff appealed, upon the following grounds:

1. Because the decision does not contain a statement of the facts found and the conclusions of law separately, as required by law.

2. Because the court erred in deciding that the recalling and cancellation of the bonds issued to the amount of $200,000, August 21st, 1871, "after the issue of the bonds under the act of March 13th, 1872," was a substantial compliance with the said act; whereas the court should have decided that the requirement of such recalling and cancellation, "before the issue," was an indispensable condition precedent, and until the condition was complied with the power to issue such bonds did not exist, and that all bonds issued under the said act prior to the performance of the said condition precedent are, therefore, null and void, and do not constitute obligations of the said city; and the court should have decreed that such bonds be delivered up to be canceled.

3. Because the court erred in deciding that the negotiation of

bonds issued under the act of March 13th, 1872, so far as the same was effected at public auction not duly advertised for the period and in the newspapers designated by the act, and so far as the said bonds were bid in for the city and subsequently negotiated privately by the mayor and aldermen, was a substantial compliance with the act; and because the court erred in deciding that such negotiation cannot now be impeached, for that it "was entrusted to the city council, which, by its recital on the said bonds, states that they were issued by a public sale thereof," and thereby gives, "under the law, sufficient protection to any purchaser for value;" whereas the court should have decided that the negotiation, as made, was not a sufficient compliance with the requirements of the act; that the sales at auction to the city were pretensive and void, and did not authorize the subsequent issue of the bonds by private negotiation; that the said statement on the bond being of a fact contemporaneous with the sale and delivery of the bond, of which all parties had equal means of knowledge, and as to which the mayor and aldermen were not invested with authority to decide, could not be made the subject-matter of recital so as to operate by way of estoppel.

That if such recital could in any case estop these plaintiffs, it cannot be pleaded by holders of the said bonds, who (not "purchasers for value" or *bona fide* holders within the technical meaning of the phrases) were parties to the negotiation thereof, cognizant of each and every violation of law therein and partakers of the fraud, and that in the hands of such parties the bonds so negotiated are null and void, and do not constitute obligations of the said city, and the court should have decreed that such bonds should be delivered up to be canceled.

4. Because the court erred in deciding that the sixth section of the act of March 13th, 1872, expressly directs payment of the loan of $75,000 due to Neagle out of the proceeds of the sale of the said bonds, whereas it should have been found that this amount was borrowed as well "for other purposes necessary for the support of the city government," and the court should have decided that the proceeds of the sale of the bonds were applicable only to such portion of the said loan as was actually expended in the construction of the new city hall and the new

market, and that the remainder of the said loan, having been negotiated without power and without authority of law, did not constitute a valid obligation of the said city.

5. Because the court erred in finding that the proceeds of the sale of the bonds issued under the act of March 13th, 1872, were not to any material extent applied to the current expenses of the city, the facts being conclusively established that the total amount received from this source is $148,364, and the amount expended on the city hall and market, from all sources, is $71,-926, leaving $76,438 as applied for the most part not to "the improvement of streets, the extension of water works or any other *improvements* judged advisable by the mayor and aldermen," but to purposes of extravagant and fraudulent expenditure, whilst a large amount of debt contracted for the erection of the city hall is yet unpaid and the construction of the city hall has not yet been completed.

6. Because the court erred in deciding that, under what is termed "the unlimited powers" in the act, "the most active schemers could scarcely have devised any plan for spending the balance" remaining after the payment of the Neagle loan "which would not have been within the vast scope of the said act;" whereas the court should have decided that under the said act an amount had been expended or set apart sufficient for the construction of the new city hall and the new market, and any and all expenditures of this fund for other purposes were unauthorized and in violation of law.

7. Because the court erred in deciding that there was no proof of such bad faith in the application of the purchase money of said bonds as would impair the title of the holders thereof; whereas the court should have found that the purchases by the Carolina National Bank, the Central National Bank and Robert K. Scott, directly from the mayor and aldermen, were made for the purpose of applying the proceeds in payment of claims against the city held by these parties respectively, which, to the knowledge of and in collusion with these parties, were contracted for and applied to purposes not contemplated by the said act of March 13th, 1872, and which, having been incurred without power and authority, were not legal and valid obligations of the

said city; and the court should have decided that the payment of the said claims out of the proceeds of the sale of said bonds was conclusive evidence of such bad faith as would constitute these purchasers trustees by virtue of a constructive trust, and should have decided that said bonds were issued in fraud, and are therefore null and void, and of no obligation against the city; and the court should have decreed that such bonds be delivered up to be canceled.

8. Because the court erred in deciding that the validity of the bonds was not affected by the omission to include in the abstract of the provision of the act, printed on the back of each bond, the condition precedent of the first section, " which required the old bond to be canceled before the new could be lawfully issued ;" and that the mayor and aldermen were the sole judges of the sufficiency of the abstract, and that their recital on the bond that the said abstract was in compliance of the act is a complete protection to the bondholders; whereas, the court should have decided that the act not being a matter peculiarly known to the mayor and aldermen, but one of which all parties are presumed in law to have knowledge, the recital of the abstract thereof on the back of said bond could in no way afford protection to the bondholder, there being no judicial action or decision devolved upon the mayor and aldermen thereby, and the omission of any reference to the condition precedent contained in the first section, " which required the old bonds to be canceled before the new could be lawfully issued," and of any recital that such condition had been complied with, operated as notice to all purchasers of said bonds that the said condition precedent had not been performed, and also of the purpose of the said mayor and aldermen to disregard this imperative requirement of the act, and put each and every of them upon inquiry at their peril.

9. Because the court did not find that certain bonds, as set forth in the complaint, held by the Carolina National Bank, Robert K. Scott and other defendants, had been pledged by the mayor and aldermen to the South Carolina Bank and Trust Company as collateral security for a loan created and expended for general purposes of the city government, and were purchased by the said defendants with notice; and that the bonds held by

Thomas B. Jeter had been pledged to him by the mayor and aldermen as collateral security for a loan created and expended for general purposes of the city government; and because the court did not decide that the city council were without power or authority to borrow money for general purposes of expenditure, or for any purpose to negotiate the said bonds by way of pledge, and the bonds so negotiated were wholly null and void and of no obligation against the said city; and because the court did not decree that such bonds be delivered up to be canceled.

10. Because the court did not find that the bonds held by the defendant, John Alexander, have never been sold or hypothecated, and were held by him without power or authority; and because the court did not adjudge the same to be null and void and of no obligation against the city, and did not decree that they be delivered up to be canceled.

11. Because the court erred in failing to find as matter of fact that the bonds held by the defendants, the Carolina National Bank of Columbia, S. C., Robert K. Scott, the Central National Bank of Columbia, S. C., the Citizens' Bank of Petersburg, Va., Clark Waring, Fanny C. Wallace, Harriet English, S. F. Trotti, Thomas B. Jeter and John Alexander, were procured by these defendants by direct and immediate negotiation with the mayor and aldermen, with notice of all the matters of fraud and irregularity alleged in the complaint; and because the court erred in deciding that these defendants are entitled to the benefit of the protection of the law accorded to *bona fide* holders for valuable consideration without notice, otherwise characterized by the law as " innocent third parties."

12. Because the defendants, Thomas C. Dunn, Robert K. Scott, C. J. Carroll, George A. Shields, John Alexander, John S. Wiley, The National Bank of Spartanburg, S. C., and Acacia Lodge, No. 94, Ancient Free Masons of South Carolina, having failed to answer the complaint, the court did not find the matters of fact alleged therein in reference to the bonds held by these defendants, and adjudged the same sufficient in law to render the said bonds null and void and of no obligation against the said city; and because the court did not thereupon decree that

the bonds held by the said defendants should be delivered up to be canceled.

13. Because the court erred in decreeing that the relators be denied the relief which they seek and dismissing their complaint.

*Messrs. Melton & Wingate,* for appellants.

*Messrs. J. H. Rion, W. A. Clark* and *F. W. McMaster,* for respondents.

October 3d, 1879.   The opinion of the court was delivered by

WILLARD, C. J.   This is a complaint in the nature of a bill by the attorney-general, in the name of the state and upon the relation of corporators and tax-payers of the city of Columbia, alleging that the municipal authorities of that city have illegally issued certain coupon bonds, claiming to have authority therefor by an act of the legislature, but having failed to conform to the requirements of such act, and demanding that said bonds may be adjudged void and decreed to be delivered up by the defendants holding the same.   The Circuit Court dismissed the complaint, and the plaintiffs have appealed.   Various exceptions are urged to the decree that will be noticed in their order.

It appears that bonds of the city of Columbia have been issued to the amount of nearly $250,000, under the act of March 13th, 1872, (15 *Stat.* 220), and as the conformity of such issues to the requirements of that act is the whole question in the case, it will be convenient, in the first instance, to inquire what are the powers of the city corporation under that act, and to what limitations and directions such powers are subject.   This involves the construction of the act in question, with a view to ascertain its intention as it regards the matters in issue.

The first section provides " that the mayor and aldermen of the city of Columbia are hereby authorized and empowered to borrow money by issuing city bonds, from time to time, to an amount which, together with the outstanding indebtedness of the city of Columbia, shall not exceed the sum of $600,000, it being thereby intended that the whole indebtedness thereof, whether

by bonds or otherwise, shall, at no time, be increased beyond the said sum of $600,000; *provided,* that, before such issue, the city council shall recall and cancel the bonds issued to the amount of $250,000, issued August 21st, 1871, for the erection of the city hall and market; *and provided further,* that no part of said bonds shall be used for the purchase of any franchise or corporation."

The second section provides the form of the bonds, their terms and the mode of authentication. The third section contains a clear limitation on the powers conferred by the first section, in the following language: "That no bond shall be negotiated under the provisions of this act otherwise than by public sale, notice of which shall be given for at least thirty days in one newspaper published in Columbia, one in Charleston and two in the city of New York, and that the sale of all such bonds shall be made by the treasurer of the city of Columbia; *provided,* that all such sales shall be conducted in accordance with such rules and regulations as the city council may prescribe."

Section 4 provides for a registry of such bonds, and for a publication by the mayor and aldermen of a detailed statement of the city indebtedness and the character of the same, at the demand of holders of bonds or corporators. Section 5 regulates the taxation to pay the interest on such bonds.

Section 6, upon which the case of the plaintiffs mainly depends, is as follows: "That the said mayor and aldermen are hereby authorized and directed to apply the proceeds of the sale of said bonds, first, to the payment of any debts heretofore contracted or which may hereafter be contracted for the construction of the new city hall and the new market; and, secondly, for the improvement of the streets, the extension of the water works, and for any other improvements which shall be judged advisable by the said mayor and aldermen; *provided,* that no part of said bonds shall be used for the purchase of any franchise or corporation."

Section 7 prohibits the city from increasing its public debt beyond the sum of $600,000, and gives an action to any corporator or tax-payer to enjoin such attempted increase.

Section 8 provides "that the said mayor and aldermen shall cause the provisions of this act, or an accurate abstract thereof,

to be printed on the back of each bond; and on the face of each bond it shall be expressed that the same is issued under the authority of this act."

The ninth section declares the privately or fraudulently issuing of any of said bonds to be a felony. The tenth section provides for creating a sinking fund on the completion of the city hall, to be obtained from the income derived therefrom, and provides that the proceeds of that sinking fund shall " be solemnly set apart for the payment of the debt and the interest thereon, contracted in the erection of said city hall," and gives a remedy to citizens in case of the failure to establish such sinking fund. Section 11 repeals all acts theretofore passed authorizing the mayor and aldermen of that city to borrow money on the bonds thereof.

The effect of the first section, standing by itself, is to authorize the city of Columbia to borrow money by bonds to a limited amount, subject to the restriction that such borrowing must not have the effect to increase the whole city debt beyond $600,000. The objects for which money shall be so borrowed are not stated in this section, although one particular object is, in terms, excluded, namely, where such money is intended to be used for the purchase " of any franchise or corporation." There is an implied object included, namely, the recalling and canceling of certain bonds alleged by the act to have been issued for the erection of the new city hall and market; but otherwise the objects of borrowing are unlimited. It was evidently intended that the bonds thus authorized should take the place, as indebtedness of the city, of the bonds referred to as having previously been issued for the erection of the city hall and market, and it is a fair inference that the authority thus conferred was to afford the means of recalling and canceling such bonds.

So far, then, as the first section is concerned, the authority to borrow was general, and for any object other than that prohibited in the proviso. This conclusion is important, for one of the fundamental questions in this case is, whether the loan was authorized for a particular object, so that a debt could only be contracted under such authority for that particular purpose, and within the limits of the authority only to the extent that was

requisite in order to accomplish such purpose, or whether the authority was intended to be general.

To illustrate this question, suppose that the mayor and aldermen, having such authority, should ascertain that the construction of the city hall and market, and the completion of all the objects fairly arising under the sixth section of the act should demand a sum less than the whole amount authorized to be borrowed, and they should find it desirable to include some other object not named in the act, such as funding the floating debt of the city, could they go on and make the whole issue and apply the proceeds accordingly ? It is to this section, when the whole nature and scope of the authority asked for was before the minds of the legislature, that we naturally look for the solution of this question. Other parts of the act may afford such solution, but here it would naturally be found. It does not appear from this section that any such limited object of borrowing money was in the mind of the legislators when framing the language that constitutes the leading feature of the act; on the contrary, confining the exclusion to one particular object, impliedly allowed it to extend to all others fairly within the scope of the municipal authority. It must be concluded that if the first section stood alone the authority would have to be regarded as sufficiently comprehensive to admit of borrowing for any proper municipal purpose other than the one interdicted, if that is entitled to be regarded as, in itself, a proper municipal object.

It will presently be considered whether other parts of the act have the effect to limit the authority conferred by narrowing down the objects for which it should be exercised, but that question is included in a more general one, namely, what are the express and implied limitations imposed by the act on the authority conferred.

The express limitations will be first considered. In the first place, the bonds issued for the erection of the new city hall and market must be recalled and canceled before such issue. That this was intended as an express limitation appears by the terms in which it is expressed. It is something to be done before such issues are made, and assumes the form of a proviso—a form consistent with the terms employed. This limitation, as well as

2 B

that precluding the use of the bonds for the purchase of any franchise or corporation, and that restricting the issue with reference to the extent of the whole debt of the city, occurs in the first section, and are the only ones made in that section.

The declaration of the third section, "that no bond shall be negotiated under the provisions of this act, otherwise than by public sale," &c., must be regarded as imposing limitations on the authority conferred by the act in the nature of a condition precedent. The language employed is negative, so that to affirm that a bond issued otherwise than as prescribed in that section was sanctioned by the authority of the act would directly contradict the declaration of the statute. The bonds, when issued, derive their actual efficacy from the act of negotiation, as that term is intended by the act, although the validity of their obligation rests upon the first section of the act, so that, certain forms of negotiation being interdicted, they cannot become the means of imparting such actual legal force to the bonds. Such a provision, having for its object the creation of new specific rights, cannot be regarded as merely directory as it regards the mode prescribed for bringing such rights into existence. This must be regarded as an express limitation of the authority sought to be conferred by the act.

The limitation fixed, with reference to the amount of the whole public debt of the city, is repeated in the seventh section, and enforced by the use of prohibitory language, and is clearly an express limitation of the authority conferred.

The next inquiry is as to what implied restrictions on the power of issuing bonds are imposed by the terms of the act. This inquiry will be confined to such restrictions as are alleged to exist by the plaintiffs, and on which they base their right to an injunction.

It is contended that the provisions of the fourth section requiring the mayor and aldermen to keep a registry of all bonds theretofore issued and outstanding, and of all bonds issued under the authority of that act, are an implied condition. The language of this section does not import a restriction in terms, but simply imposes on the officers of the corporation the duty of doing something which, so far as it relates to the bonds issued

under this act, could only be properly done after such bonds had been issued and had assumed full validity. It amounts to a requirement that a certain public record should be made of the transactions in regard to the issuing of bonds; and as a record of a transaction is naturally made after the transaction is consummated, it is not to be assumed that the legislature intended to make the validity of issued bonds depend on the compliance with such requirement. In other words, the making of the record of the issuing of the bonds is not an act which, in its nature, must precede the lawful issuing of the bonds, and, therefore, it cannot give rise to an implied limitation of the authority conferred by the act.

It is also contended that there is an implied restriction of the authority conferred contained in the sixth section. The language of this section is that the mayor and aldermen " are hereby *authorized* and *directed* " to apply the proceeds of the sales of the bonds to certain objects in the first instance. To authorize and direct does not necessarily imply that the matter so authorized and directed is a condition precedent to some authority already fully conferred in another and appropriate place. This is enough to exclude this section from the category of express limitations. It remains to consider whether there is evidence on the face or in the nature of the requirements of the section to warrant the conclusion that it was intended as a condition precedent, or even as a condition subsequent, to the validity of the bonds. The plaintiffs have got to make out of this section something equivalent to a declaration that unless the moneys received from the sale of the bonds are applied in a particular way, the bonds so issued, under some circumstances and in some cases at least, shall be void.

The direction is: " First, to the payment of any debts heretofore contracted, or which may hereafter be contracted, for the construction of the new city hall and the new market; and, secondly, for the improvement of the streets, the extension of the water works, and for any other improvements which shall be judged advisable by the said mayor and aldermen." The plaintiffs read this as if it directed the city corporation to build and complete a city hall and market and apply the proceeds of

the bonds exclusively to that purpose until completed and paid for, and after that they must go on and devise improvements until the whole money should be consumed. In other words, they try to make a sort of trust out of it, instead of regarding it in the only light in which it can properly be viewed—as a mere provision for funding the present and future debt of the city, not exceeding a certain amount, giving preference in the funding to a class of debts of a particular character. This is the whole scope and character of the act, as is manifest by its various provisions. Whether the erection of the city hall and market should be continued or abandoned was a matter properly left to the judgment of the municipal authorities as a matter of a purely local concern. This section must, therefore, be stripped of the idea that the proceeds of the bonds were a trust to build a city hall and market.

The plaintiffs' view of the eighth section appears still more inadmissible in its application to the objects contained in the second direction as to appropriating the proceeds of the loan. The subject here is " the improvement of the streets, the extension of the water works, and for any other improvements which shall be judged advisable by the said mayor and aldermen." It would be difficult to make out of this sweeping language the case of a particular and prescribed improvement in respect to the consummation of which the money available for that purpose was to be regarded as a trust. In the first place, no defined object can be made out from the terms employed, to which, as matter of construction, the court could say the money ought to have been applied, and, in the next place, the discretion of the city authorities to enter upon such improvements and to abandon or complete them at will is fully recognized, and no attempt is made to interfere therewith. If we were required to say what was to be regarded as an improvement in the sense of the statute, we should find great difficulty in so doing. In the first place, the mayor and aldermen are to determine what are and are not to be regarded as improvements, and if their determination is subject to any limitation arising from the intended sense of the word improvements, as used in the statute, we would find it very difficult to find the key of that sense. When an assumed con-

struction of an act runs out into vague and limitless questions and considerations, it may be taken to be aside from the true construction. The true construction is that which was in the mind of the legislators as evidenced by their language, and is generally characterized by the simplicity and completeness of the object in view. The view that has already been developed removes all these difficulties of construction by holding that the object of the statute was to enable the city to fund its floating debt, contracted, or which might be contracted, within a certain limit, giving preferences in such funding to certain classes of obligations.

In order to fully appreciate the consequences arising under this view of the authority conferred, it is necessary to distinguish still more clearly the difference in point of law between the present view and that held by the plaintiffs. For that purpose each will be more particularly stated. The view that the object of the loan must be regarded as intended to enable the city to fund its floating indebtedness, present or future, is based on the idea that the act conferred no new authority or duty on the mayor and aldermen as it regards the building of a city hall and market, and the other works mentioned in the eighth section, and that it does not diminish such authority or change the nature of the discretion and responsibility of the city government as it regards the initiation, conduct, suspension or abandonment of such works. The act must, then, be regarded as intending no effect upon that class of municipal powers employed in bringing into existence the classes of debts which may be funded under that act.

Without the statute the city could, at will, undertake any such work, but would be compelled to treat the debt created as calling for immediate payment, and the proceeds of its taxes and other revenues and property would be immediately liable for the payment of such debts. Now, what the act sought to do was to allow the city to maintain a permanent credit as the means of discharging such debts. This is, in effect and substance, funding such debts, and there is no more difficulty in conceiving authority granted for the purpose of funding future debts than

that to fund debts already contracted; the operation and effect is the same in both cases.

The plaintiffs' view, on the other hand, is that a fund was intended to be created in the hands of the city government for the accomplishment of certain specified objects, in which case a special trust to apply it to those objects would exist. The difficulty in the way of this view is, as already illustrated, that such trust could not exist except where there was a specific object on which it could act. In a general sense, wherever property or money is in the hands of a public agent for disbursement upon general objects of a public nature, a trust to apply it so exists. Such a trust is, in its nature, political, and in this respect differs from the special trusts that are cognizable in equity on the demand of a *cestui que trust.* It is true that public trusts in the hands of municipal bodies may, to some extent, be enforced through the intervention of the attorney-general, but not upon the idea that the equity of the *cestui que trust* demands such enforcement, but upon the more general ground that the public authority, whether vested in the king or in the state, has a supervisory control over all trusts of that nature, as in the nature of public charities. In this country the application of this principle is necessarily much modified by the more distinct recognition of the principle of local self-government, that tends to a liberal construction of the legislative powers vested in municipal communities.

The plaintiffs' view, in effect, makes the state the beneficiary of the powers conferred upon the city authorities, instead of the municipal body itself. It is clear that all the restrictions imposed on the city authorities were intended for the benefit of the municipality. Hence the plaintiffs call the parties into a court of equity on the same footing as if a trust had been created in which the state had a beneficial interest, and demand a remedy that leaves out of view both the interest and the duty of the municipality, as will be made to appear.

It is clear that the provisions of the sixth section are not to be regarded as creating a condition on which the validity of the bonds should depend, but as merely giving a direction as it regards the disposition of the proceeds realized from the sales of

such bonds. The statute assumes that when the period arrives for disbursing the proceeds derived from the sale of the bonds, that bonds will have previously been issued and in full force and effect. It is not to be assumed that it was intended that the lender of the money to the corporation should be responsible for the rightful application of such money; hence we must conclude that it was no part of the scheme or intention of the act that the validity of the bonds should depend upon the due application of the moneys to be derived from the sale thereof, and therefore there is no implied condition of that character imposing restrictions on the authority conferred. If a party happens to get possession of the bonds while still the property of the city, without compensation or lawful authority, that, no doubt, would be a conversion for which an action would lie, and the bond, would be worthless in the hands of one so holding without negotiation and consideration; but that is very different from the proposition advanced by the plaintiffs, that the bonds in the hands of such wrong-doer are void in virtue of an express or implied limitation of the authority to issue them, as it regards the use of the money arising from the sale thereof.

Then, as the object of the statute was that of enabling the city to fund its floating indebtedness, with a preference of the debt incurred, or to be incurred, of a certain class, it would follow that when the proceeds of the loan were realized the disposition of these funds ought to be made upon the following principles: *First.* The debt already created for the erection of the city hall, and for which bonds had been already issued, should be paid. *Second.* A sum should be set apart sufficient to pay for all the work intended to be put upon the city hall and market. *Third.* Any debt arising from the class of improvements mentioned in the second clause of the sixth section should be paid, and if any contracts or obligations for any such improvement are outstanding, to fall due in the future, should be set apart for the payment of the same. *Fourth.* If the mayor and aldermen determine at that time that any further improvements of that class should be undertaken on the faith of that fund, then a proportionate part thereof should be set aside accordingly. If, on the other hand, the municipal authorities do not contem-

plate or intend any such further works of improvement, or if they do intend improvements of that character, but conclude that the same should be paid for out of current income of the city, then all further requirements of the statute as it regards the disposition of the fund, are satisfied, and the balance of the fund could, consistently with the general purpose of this act, its special directions being satisfied, be applied to funding the existing outstanding indebtedness of the city.

Assuming, then, that this present complaint could be maintained by showing that the statute has not been complied with, its equity would consist in the statement that debts of the character provided in the sixth section were outstanding at the time of the filing of the complaint. In fact the only debt alleged or proven to exist at that time of the class referred to is a balance on account of the construction of the city hall, now in judgment against the city, which will be considered hereafter.

It is contended that the duty imposed by the eighth section, as it regards the endorsement on the bonds of the provisions of the act, or an accurate abstract thereof, constitutes an implied restriction of the power of issuing bonds in the nature of a condition precedent on which the validity of the bonds must depend. The terms employed do not expressly warrant such an inference, and if it arises it must be from the nature of the act required to be performed by the city authorities. It cannot be assumed that the rights of the lender were to be made dependent upon the good faith and diligence of the borrower. Such a presumption is inconsistent with all principles of fair dealing. The purchasers of the bonds were bound to know the provisions of the statute, and whether in point of fact they did know them or not they are clearly chargeable with such knowledge. The only object, then, in view was, in point of fact, to give them actual knowledge of that which the law assumed them to know independently of such special means of information. Publishing the statute, or an abstract thereof, did not enlarge or in any way change the legal responsibility of the purchasers of the bonds, but only enabled them to provide against the full measure of their responsibility. It was, therefore, a provision wholly for the benefit of the purchasers of bonds, and if neglected by the

opposite party the purchasers are the only losers, and should not be put in a worse position by reason of such neglect. It must be concluded that the requirements of the eighth section are not a restriction upon the authority to issue bonds, and that the validity of such issue does not depend upon their fulfillment.

Having obtained an understanding of the intention of the legislature, it remains to consider the various exceptions that have been taken to the Circuit decree.

The first exception has been previously disposed of by this court, holding that the neglect of the referee or Circuit judge to present distinct findings of fact and conclusions of law is not error. It is to be regretted that so little regard is paid to this salutary requirement, but the remedy is not by appeal to this court on the ground of error in the judgment. What might be the effect if a motion refused to correct such irregularity as a foundation of an appeal, we are not called upon to say, as that is not the present case.

The second exception is based upon the ruling that the issuing of the new bonds while the old bonds were still unrecalled and uncanceled did not necessarily, under the circumstances, destroy the validity of the new bonds from and after such recalling and cancellation had actually taken place. The plaintiffs are in equity where mere technical forfeitures are not considered but only substantial rights and injuries. Whether the new bonds could have any legal efficacy until the old bonds were recalled and canceled is not the question here. The true question is whether the allegation of the invalidity of the bonds in the complaint was true when it was made. In this respect the conclusions of the Circuit judge appear to be substantially correct. It must be assumed that the new bonds were issued with the intent to recall the old bonds by means of the proceeds realized from them, for that is what the statute required and was in fact done. It is reasonable to conclude that this was the only way in which it was practicable to retire them. Such an issue did not necessarily violate the ultimate intent of the statute, and, therefore, is not reprehensible. It is true it did not conform to the requirements of the act, and could not create the rights intended to be created by the act. When the plan was consummated and the

old bonds retired and canceled, there was no impediment to the new bonds assuming validity. Under such circumstances, equity will look to the substantial rights of the parties, and, as the plaintiffs have sought a remedy in equity, they must submit to have the validity of the bonds determined upon equitable principles. This exception should be overruled.

It is objected that the sales of the bonds were not made at public auction, as the act required. The Circuit judge finds otherwise, in point of fact, and there is good ground for such finding. The parties who purchased at the auction sales must be regarded as legally bound by the consequences of such purchases, so that had the bonds subsequently sold for a less sum they would be responsible for the difference. The fact that they purchased for the benefit of the city made them volunteers, but not necessarily agents, and, as such, the legal undertaking was binding, and the bonds must be regarded as sold in the sense of the statute.

As it regards the advertisement, it appears that due advertisement was made before the commencement of the sales. It appears from the testimony of Mayor Alexander that the first sale was regularly adjourned to a day certain, at which it was resumed, and again adjourned to a further day, when the balance of the bonds were sold. It was not necessary to repeat the original advertisement, as the adjourned sales are, for all legal purposes, a continuation of the original sale, which was properly advertised. The conclusions of the Circuit judge should be sustained in this respect.

The plaintiffs' fourth exception is not well taken. In the first place the act itself fixes the character of the indebtedness arising on the $75,000 note. It is undisputed that the bonds previously issued, as referred to in the act, were hypothecated for the security of this note. The first section of the act declares that such issue had been made "for the erection of the city hall and market." There is no other transaction than this to which the statute could refer, and the identity of the transaction is made apparent by the terms of the resolution of the council under which the loan was negotiated. This resolution gave authority "to borrow money from time to time, as may be neces-

sary, to carry on contracts for building the proposed extension of the market and erecting a new city hall," &c. It appears in evidence that the loan was negotiated under authority derived from this resolution. It is contended that the actual intention in making the loan was to raise money for other purposes than those expressly named in the resolution, but this is immaterial to the present view, which is that, as it regards the disposition of the proceeds derived from the sale of the bonds, direct statute authority existed for applying such proceeds to the payment of this loan. It is not a question of the general satisfaction of this transaction, but merely of the proper disposition of the proceeds of the bonds under the statute. The fundamental requirement of the statute was that these previously-issued bonds should be recalled and canceled. Unless this should be accomplished the purpose of the act becomes entirely ineffectual. To recall implies to get back by treaty or contract. ⋅ That this was the intent of the statute is made evident by the sixth section, which provides for the debts theretofore contracted for the very purpose which in the first section is declared to have been the purpose of the previous issue of bonds. The conclusion is irresistible that the statute intended that the debt for which the previous issue was a security should be paid out of the proceeds of the new issue, and as the $75,000 note is without doubt the obligation referred to, abundant authority to pay it existed. This view disposes of all the questions relating to the validity of the payment of that note.

The fifth exception is based upon an obvious misconception. It is assumed that moneys disbursed for "current expenses" of the city, cannot be regarded as disbursed in accordance with the requirements of the sixth section of the act. But, for the passage of the act, all the debts created for the purposes specified in the sixth section would have been necessarily liquidated as part of the current expenses of the city. The chief object of the act was to provide a means of defraying *certain* current expenses of the city by means of a resort to a permanent credit, instead of having recourse to current annual income. These current expenses are equally such, whether to be paid for in the one way or the other. The proof, then, that money derived from the

sales of the bonds was applied to "current expenses," is in itself wholly indecisive, whether it was properly applied or misapplied, as part at least of these current expenses were the very object of the statute for which authority to borrow money was given. It was for the plaintiffs, on whom the burden of proof rested, to show that the current expenses thus paid were not of the class that the statute contemplated, and this the plaintiffs have altogether failed to do. The plaintiffs offered no proof that any part of the money was expended for purposes other than such as constituted proper municipal objects, and all charges of fraudulent misapplication are unproved and no attempt was made to prove them. There is, therefore, no ground in the evidence to reverse the conclusion of the Circuit judge, who finds no substantial diversion of the fund, although his conclusion would have been strengthened by placing it altogether on the defect of proof to show that improper current expenses had been paid out of the fund.

The court could not have decided against the defendants the proposition advanced in the sixth exception, that any and all expenditures of the fund for other purposes than for the construction of the new city hall and the new market were unauthorized and in violation of law. In the first place, the proposition ignores the duty of paying the debt for which the old bonds were hypothecated. In the second place, it erroneously treats the city government as under an obligation to build a city hall and market in the nature of a trust. And, finally, it advances the erroneous conclusion that there could be no lawful expenditure of the money raised until the city hall and market were actually paid for, or a sum actually set apart to pay for them when completed.

The seventh exception cannot be maintained. There is no ground to set aside the finding of fact by the Circuit Court that the defendants, who were purchasers of the bonds, were innocent holders for value, a finding fairly embraced within the conclusions of the Circuit decree. Such a fact can only be reversed upon overbearing testimony, as the *onus* of proving such to be the case rests on the plaintiffs. So far from the conclusion of the Circuit Court being overborne, there is no evidence of the fact of

the misapplication of the moneys, and, therefore, nothing of which to charge the bondholder with knowledge prejudicial to his claim. The evidence that the money was paid, or, what is equivalent, that the bonds were specifically delivered to satisfy debts existing for current expenses of the city, is, as we have seen, wholly indecisive of any such misapplication. No other evidence was offered that could be the foundation of a charge that the persons taking these bonds had knowingly connived at a breach of trust on the part of the municipal officers. There is no proof that any of the defendants knew, at the time they took their bonds, that there were not adequate funds in the hands of the city, derived from the bonds, to meet all outstanding demands under the sixth section of the act. The city had it in its power to stop all improvements of the class named in the sixth section, and, on paying what was due up to the time of so stopping, could expend whatever remained in their hands for the funding of any part of its floating debt, and, having such ample powers, no reason exists why third persons should not deal with them accordingly. Such persons would have the right to assume that the city, having authority to make good its dealings in that respect, would do so. The position of *bona fide* holders can only be decided upon the ground of evidence and as against the presumption of innocence. It is not possible to wield against them the argument of general corruption, even if it had proved to exist. The greater the evil resulting from maladministration, the greater the importance that it should not invade the administration of justice, and to take away the rights of citizens on general charges and suspicions, would be as corrupt, as a judicial act, as any charged in this case against the municipal authorities, and more dangerous to the community.

The eighth exception is mainly disposed of by the conclusion that the endorsement of the abstract on the bond was not a condition on which the validity of the bonds depended.

The ninth exception has, in part, been disposed of by the conclusions already stated. It raises, however, a question whether the corporate authorities had power to borrow money for the use of the city and to bind the city for the repayment thereof. This question is not raised by the pleadings and proofs in such man-

ner as to call for a decision upon it.   It appears, by the admission of the complainant, that the various obligations of the city that were discharged by a delivery of the bonds in question, were contracted for the benefit of the city.   Several of these obligations appear to have arisen on account of money borrowed for the use of the city.   The main point made by the complaint is, that the purposes for which the money was borrowed in that class of cases, were not such as those indicated by the sixth section of the act, the object of this averment being to show that the issue of bonds under the act had been made for debts contracted for other purposes than those contemplated by the sixth section. Incidental to this averment of the complaint are allegations that may be construed as questioning the right of the corporate authorities to borrow money.   The ground thus alleged for invalidating these debts is, that the city had no authority to borrow money in such cases.   It appears, however, that these debts have been paid by the delivery of bonds for that purpose, and the question arises whether the authority of the city officers to create such debts can be questioned after their actual payment.   This question will be next considered.   The bearing of this question on the case made by the plaintiffs is this : It amounts to an allegation that part of the bonds issued under the act in question were issued by the city authorities upon no consideration, and, therefore, without authority of law.   And their conclusion is that such issue is illegal and void.   If the debts that were discharged in this manner were not legal debts, the consequence would be that the city would have an action against the parties who had received either money or property of the city in discharge thereof from the city authorities to recover back such money or property or its value.   It is clear that if the city could not maintain such a cause of action, then the plaintiffs, in behalf of the city, cannot allege that the debts were invalid, for that would be allowing indirectly that which could not be done directly. The question, then, resolves itself into that of the right of the city to recover from the parties these amounts paid to them in discharge of debts, the validity of which is questioned.   Assuming the simplest form in which this question can be stated, we will suppose that the city authorities borrow money for the use of the

city and subsequently repay the amount so borrowed.    Has the
city, in an action to recover back the amounts so repaid, a right
to show that the original act of borrowing was without legal
authority ?    The city having got the benefit of an illegal trans-
action was bound—morally if not legally—to refund the same.
Such would be the rule of moral duty that would force itself
upon the mind of any conscientious person in a like situation,
and the moral duties are the same in their application to individ-
uals and communities of individuals.    Such a moral obligation
is a good consideration to support the payment that rests upon it.
Hence, money voluntarily paid to discharge an obligation cannot
be recovered back upon the allegation that such obligation was
without legal force.    If, after such payment, the city could not,
in its own behalf, allege the invalidity of the original act of bor-
rowing, it cannot be done by the attorney-general or any one else
in behalf of or in the interest of the city.    It follows that if the
attorney-general had filed a bill specially framed to compel the
defendants who had received money or property under such cir-
cumstances to repay the same on the idea of a breach of public
trust or duty, he would have failed, for the reason that equity
pays the same respect to moral obligations that is paid at law,
but goes further than the law can go to enforce them, and as the
law would deny such a remedy on such grounds, equity would,
at least, do as much.    The present bill, so far as it can be re-
garded as attacking the consideration upon which the bonds were
issued, has this aspect and effect.    The ninth exception should be
overruled.

The complaint charges that John Alexander individually ap-
propriated certain of the bonds in suit to his individual use, with-
out consideration, and retained bonds that had not been issued
to the amount of $1000.    Alexander does not appear to have
answered the complaint, in this respect, and its allegations must
be taken as true.    As these allegations are not necessarily con-
nected with the principal matter of the complaint, in regard to
which the plaintiffs have failed to make due proof, they are
unaffected by such fact.    The tenth exception is, therefore, well
taken, and the decree should be set aside, so far as it regards the
matters alleged against the defendant, Alexander, individually,

and the cause remanded for a judgment, in accordance with the prayer of the complaint, as affecting defendant Alexander alone.

The matter of the eleventh exception has already been disposed of.

The construction that has been put upon the act of 1872 leads to the conclusion that the only possible equity of the complaint would be in an allegation that debts preferred by this act in the order of funding had not been so discharged, and remained unpaid at the commencement of this suit. It might still be a question whether that equity does not belong exclusively to the parties in behalf of whom such preference was given, but that question has not been raised and need not be considered. It does not appear by the allegations of the bill that any such preferred debt existed at the commencement of this suit. It appears, however, in evidence, that there is a demand outstanding for the erection of the city hall, in behalf of C. Waring, which has been put in judgment against the city. Waring is made a party defendant, but instead of insisting on any equity under the act of 1872 resists the plaintiffs' demand for relief.

As it regards the unpaid demand of Waring, now in judgment against the city, it must be concluded that the city is in possession of a fund especially devoted by the act of 1872 to the payment of such debt, namely, the " annual income derived from such parts of the said city hall as may be leased from them, the proceeds of which sinking fund shall be solemnly set apart for the payment of the debt and the interest thereon, contracted in the erection of the said city hall." It might well be a question how the creation of this sinking fund can be reconciled with the construction put by the plaintiffs on the sixth section, that that debt was to be paid absolutely and at all events out of the proceeds of the sale of the bonds. If that had been the intention of the act it would hardly have named another and distinct fund for that purpose. But it is not important that this question should be considered, for it is clear that the act intended that if that debt should not be paid out of the proceeds of the bonds that it should fall on the sinking fund, and that contingency has actually happened. This leads to the conclusion that the city

having in possession the fund thus solemnly pledged, ought to appropriate that fund to pay the Waring judgment.

The defendants, who failed to answer, lost the benefit of the right to set up their claims as *bona fide* holders; but as the principal matter of the bill fails for want of proof, and the case alleged against all these defendants, except Alexander, is necessarily connected with that aspect of the complaint, there cannot be judgment against them.

The decree of the Circuit Court should be affirmed as to all things, except the dismissal of the complaint as against defendant Alexander, and as to said defendant, the cause should be remanded for a decree against that defendant, in accordance with what has been already held in that respect.

McIVER, A. J., concurred in the result.

HASKELL, A. J. I dissent from the conclusions reached by a majority of the court, and proceed to present my reasons.

The action is brought in the name of the state, by the attorney-general, *ex rel.* taxpayers and corporators of the city, against the said city, its public officers and others. It seeks injunction and relief on the ground that breach of trust has been committed; that onerous taxes are about to be and have been imposed to pay the interest on illegal bonds, and that the holders of said bonds, or many of them, being parties to the legal fraud, should be made to deliver up the bonds. The right of the state to institute such a proceeding, in such behalf, cannot be successfully disputed, nor is that question made in the pleadings or by exception. But comments are made and grounds taken in the opinion, which decides the case, which so narrow the scope of such a proceeding as to deprive it of all efficacy, and to take away from the members of municipal corporations the substance of the remedy by which they have hitherto been protected when fraud or illegal acts have been perpetrated by the corporation, its officers or parties dealing with them. It does not seem to be denied that the act of March 13th, 1872, creates a trust by conferring power to borrow money, and directing to what purposes the money shall be applied; but it is said that the trust is political

2 c

in its nature, and differs from special trusts, which are cognizable in equity on the demand of a *cestui que trust.* The meaning of that is that the only remedy possessed by corporators is to be found in the power of electing better officers. To support such doctrine it is said that municipal corporations, in republican governments, possess powers of local self-government which create a wide distinction between the jurisdiction of chancery in England and that in this country on such subjects. The question is serious in its character, and the majority of the court having concurred only in the results reached, it is left entirely open to conjecture what are the processes of reasoning by which such conclusions were reached. I shall, therefore, devote some attention to the jurisdiction which equity has in such cases. The original jurisdiction conferred upon the Court of Chancery in this state was as large as that exercised at the time by the said court in any of the American provinces. See acts 1712, 1721 and 1746, 7th vol. Statutes.

It is shown in the case of *Attorney-General* v. *Jolly,* 1 *Rich. Eq.* 99, and in *Vidal* v. *Girard,* 2 *How.* 127, that the jurisdiction was equal in extent to that exercised by the Court of Chancery in England. The difference being not in the jurisdiction of the courts in the two countries, but in certain powers vested in the Chancellor personally, when he administered for the king, and that the statute of 43 Elizabeth, on charitable uses, not being of force in this state, does not take from the court any of the subjects which it contains, because it conferred no additional jurisdiction on the court in England, which already had jurisdiction of those subjects, but only gave a new or ancillary remedy. Our court, therefore, in the exercise of its original jurisdiction, has charge not only of the subjects recited in the act of Elizabeth, but of many others of like nature not therein mentioned. We can, therefore, with manifest propriety, place great reliance upon the English authorities in such cases when those of like nature come before us. No authorities, English or American, have been cited to sustain the proposition that the jurisdiction over municipal corporations, in cases of public trust, have been modified or diminished, and none can be found in our constitution or statutes; nor any to show that such corporations

have any right of local self-government independent of the grant contained in the charter.

On the other hand, Judge Dillon, in his work on municipal corporations, Section 736, says: "That there appears to be no difference of judicial opinion as to the *right of the taxable inhabitants*, wherever the threatened illegal corporate act will increase the burden of taxation, to the *aid of equity to prevent it*. The difference is as *to the proper party plaintiff* in a bill of this character. \* \* \* But it is agreed that any taxable inhabitant, or, perhaps, any citizen of the municipality, has such an interest to *prevent* or to *avoid* illegal corporate acts; that he may be a relator, on whose application the proper public officer of the commonwealth may, on behalf of the public, file the requisite bill to *enjoin* the menaced illegal act, or, if *it has been consummated*, to *have relief against it.*" He is fully sustained by the authorities which he cites. That questions which affect at large the interest of the inhabitants of a municipal corporation are " public" in their character, flows from the nature of the corporation. It is the creature of legislation, brought into being to share in the civil government of the country, having power, not over specified persons, but over the fluctuating population as it comes within its limits. Such power is held in trust, subject at any time to be revoked by legislative repeal; and its exercise, while it continues in existence, is as properly the subject of judicial supervision and control as the conduct of any person or other legal entity.

While corporations and their officers may be parties to proceedings at law, they are in many cases peculiarly within the province of equity. For, as is said incidentally by Wardlaw, Chancellor, (*Ex parte Greenville Academies,* 7 *Rich. Eq.* 483): "In truth, nearly all corporations are trustees, as an incorporated bank for the stockholders."

And as is more fully said by Denio, C. J., (*Darlington* v. *Mayor, &c., of New York,* 31 *N. Y.* 197): "It is the representative or trustee of somebody, or of some aggregation of persons. We cannot conceive the idea of an aggregate corporation which does not hold its property and franchise for some use, public or private. The corporation of Dartmouth was held to be the

trustee of the donors, or of the youth needing education and moral and intellectual training. The corporation of New York, in my opinion, is the trustee of the inhabitants of that city. The property, in a general and substantial although not in a technical sense, is held in trust for them. They are the people of this state, inhabiting that particular subdivision of its territory—a fluctuating class, continually passing out of the scope of the trust by removal and death, and as constantly renewed by fresh accretions of population. It was granted for their use and held for their benefit. The powers of local government, committed to the corporation, are precisely of the same character. They were granted and have been confirmed and regulated for the good government of the same public; to preserve order and obedience to law, and to ameliorate and improve their condition and subserve their convenience as a community."

The corporation thus holding a trust, and that trust being of a public character, the suit in equity, instituted by the state, is appropriate. Trusts for the benefit of the public have been always held in this state to be within the jurisdiction of equity, (*Attorney-General* v. *Jolly*, 1 *Rich. Eq.* 99,) and come within the rules which govern in all charitable uses. That gifts for general public improvement, utility, ease or convenience are charitable is fully sustained by the authorities. *Perry on Trusts*, § 704, and cases there cited. The suit, in such case, to enforce the trust or restrain its abuse, and for relief, may be brought by the state, where the government is the only party concerned, or by the state at the instance of relators where the rights of the government are not immediately concerned, but the interests of the public are affected: See remarks of Harper, Ch., in *Attorney-General* v. *Jolly*, *supra*, and *Story's Eq. Pl.*, § 8.

It remains to be shown, in support of the position I hold, that all funds put into the hands of municipal corporations for public purposes constitute public or charitable trusts, cognizable in equity, and that the relators are, therefore, not confined to the ballot box for relief, but are entitled to the aid of equity. The general answer to this proposition is that while it may be true as to a gift, it does not apply to funds raised by taxation, or by bonds payable by taxation, which amounts to the same thing.

Or, as it is expressed in *Hill on Trustees*, \*454, the *fund must proceed* from the gift or bounty, either of the crown or state, or some private person, otherwise it will not be charitable, and, therefore, rates or assessments, levied under an act of parliament by the inhabitants on themselves for the improvement or benefit of their town, are not charitable funds to be administered by the court, for there is no gift or bounty in the creation of such fund. The authority cited by Hill is *Attorney-General* v. *Heelis*, 2 *Sim. & Stu.* 77, decided in 1824. It is true that such language is there used by the Vice Chancellor, Sir John Leach, who says that he is " of opinion that it is the *source* from whence the funds are derived, and not the mere purpose to which they are dedicated which constitutes the use charitable;" and he then proceeds to illustrate by supposing the instance described by Mr. Hill, as above. But that was not the case before him, for he held the funds to be charitable, and his opinion is a mere *dictum*, although it is referred to with great respect. Examination of the authorities will show that the opinion thus expressed by Sir John Leach was never admitted to be law, for, in *Attorney-General* v. *Mayor, &c., of Dublin*, 1 *Bligh* (*N. S.*) 312, decided in the house of lords in 1827, the very instance supposed by the Vice Chancellor arose, and the doctrine which he had announced was entirely disapproved by Lord Eldon and Lord Redesdale, who, in the case of the city of Dublin, delivered the opinion of the house of lords. All the cases are reviewed in the more recent case of *Attorney-General* v. *Eastlake*, 45 *Eng. Ch.*, 11 *Hare*, 205, which is very similar to the case before us, and quite in point. It is there held that the city of Dublin's case had clearly established the principle that, in a suit brought by the attorney-general at the relation of rate-payers of the city, the court had jurisdiction to compel the corporation to account for funds raised by taxation under an act of parliament to supply the city with water works, and to compel the replacement of funds which had been improperly applied. The language of Lord Eldon in *Attorney-General* v. *Browne*, which preceded *Attorney-General* v. *Heelis*, is cited at length in Eastlake's case. Only the conclusion need he repeated here. " I have heard nothing," says Lord Eldon, " which prevents my concurring in

the opinion that a parliamentary grant, destined to such purposes, (public benefit of a town,) is a gift to charitable uses. If that doctrine is to be contradicted, it must be done by higher authority than mine." The grant was a power to collect toll to be applied to public purposes, and all the cases cited show that a grant of power to collect a tax for such purpose is precisely similar and governed by the rule laid down by Lord Eldon. The language used in *Attorney-General* v. *Eastlake* is a conclusion drawn from the leading cases, and is very clear on both the above points. "The difference of reasoning to which the remarks of Lord Eldon in *Attorney-General* v. *Corporation of Dublin* apply, consists in the distinction taken by Sir John Leach, that you are to look at the source from which the funds proceed, and not merely to their object. However, Lord Eldon, in the case of *Attorney-General* v. *Corporation of Dublin*, adheres distinctly to the view which he had taken in the earlier case, (*Attorney-General* v. *Browne*); and there can be no doubt that the conclusion of the house of lords was that the mode in which the rate was levied was not to be looked at, but the purpose to which it was to be applied, and I apprehend the purpose must be the real criterion." The purpose was, in Eastlake's case, paving and lighting the town. "It is sufficient to say it is a large and general purpose for this town, although not beyond the limits of the town, and that for that purpose certain moneys are to be levied. I cannot see that the source from which those moneys are here derived, namely, from taxation, can make any difference as to the charitable and public nature, and which would be attributable to the funds if they proceeded from a more limited sphere of bounty; and if there be no distinction on that ground the attorney-general is the proper person to represent those who are interested in that public and general or charitable purpose." See, also, *Beaumont* v. *Oliveira*, 4 *Eng. Ch. App. Cas.* 310; *Attorney-General* v. *West*, 10 *Hart, Jury Com., Eng. Eq. Cas.*, *152.

So much for the jurisdiction and the propriety of the form of action brought. If these views are sustained by the authorities, it follows that the grounds on which relief may be demanded, and the relief itself are of vastly greater extent than is allowed

in the opinion which represents the majority of the court. In *Attorney-General* v. *Eastlake* it was admitted that the money was applied to purposes within the range of the ordinary powers of the body acting; but because the funds were diverted from the purposes for which they had been collected the court enjoined further misapplication, and ordered that the fund so expended should be replaced by the defendants. So, in *Attorney-General* v. *Aspinall*, 2 *Myl. & Cr.* 613, which is, in principle, exactly similar to the case before us, parties with whom the corporation had been improperly dealing, were brought in, and it was held that the application of the funds to purposes other than those named in the act was a breach of trust; that the parties so dealing had notice; that the appropriation must be rescinded, and that the funds thus misapplied must be recalled and delivered up. Instances might be multiplied without end, but the above are sufficient to show what are the usual principles of law and practice by which courts are governed in such cases.

I come now to the points properly presented by the pleadings and the exceptions, and on which my conclusion differs very materially from that of the majority of the court. Among the most important differences are those which arise from the constructions put upon the act of March 13th, 1872. It is said (1) that among the primary objects for which money shall be borrowed under the power conferred by the act is an *implied* object, namely, the recalling and canceling of certain bonds referred to in the act as having been issued in 1871 for the erection of the new city hall and market.

The first section of the act authorizes the city council to borrow money by issuing bonds, but *provides*, " that before such issue the city council shall recall and cancel the bonds issued to the amount of two hundred and fifty thousand dollars, issued August 21st, 1871, for the erection of city hall and market." It is a condition precedent, as absolute as words can make it, for it directs what must be done before the power previously conferred can be exercised. Yet it is contended to mean exactly the reverse, and that the new bonds shall be issued prior to the recall and cancellation of the old, in order that by the sale of the new bonds the city council might acquire means, and out of the pro-

ceeds of the new buy in the old bonds.   Such interpretation negatives the power of words to express thought, and renders futile any attempt on the part of the legislature to attach conditions to its grants.   The construction, however, really rests for its support upon a clause in Section 6 of the act, which directs that the proceeds of the bonds shall be applied "*first* to the payment of debts heretofore contracted for the construction of the city hall," &c.   It is said, in substance, that because Section 1, in its proviso, states that the $250,000 in bonds, issued August, 1871, were "issued for the erection of city hall and market," that those bonds, or any loan for which they may have been pledged, represented the "debt heretofore contracted," mentioned in Section 6 ; and that Section 6, therefore, entirely superseded the provision in Section 1, and rendered the old bonds the prime object of the new bonds ; whereas, from the ordinary sense of the words used, the act would seem to condemn the old bonds, and orders the cancellation of the same before the city shall be allowed to exercise the new power which it sought and obtained by the act of March, 1872.   The legal result of the construction given to the act by the court is the recognition of the validity of the old bonds, and the practical result would have been, if any such idea had then been entertained, that the old bonds would in all probability have been as good as the new, and consumed the latter, dollar for dollar, in the cancellation of the former.   The answer is that the old bonds had been hypothecated to a limited amount, and were under control of the city on payment of that sum.   That may be true, but the price obtained for the new bonds may not have been in excess of that sum.   The true reply, however, is that there is no evidence of that fact in the statute ; and when a court is seeking the legislative intention, it must confine itself to the language used by that body, and not be influenced by extrinsic facts.   *Sedg.* 241.

It is only by the evidence given at the trial that it is shown that the old bonds had been pledged for a debt outstanding at the time the act was passed, yet it is by that fact alone that the clause in Section 6 has been linked to the *proviso* in Section 1, and thus the true purpose of each portion of the act utterly defeated.   It is hardly necessary to say more.   The proviso is a

condition precedent, which must be performed before the trust fund could come into existence. Section 6 is a direction subsequent, and undertakes to dispose of the application of the funds. The latter could not go into force until the former had been done, and it is unjustifiable to suppose that the legislature meant a thing so flagrantly contradictory to what the words express.

The true and fair presumption is, that the issue of the bonds in August, 1871, was regarded as an illegal act, and for that reason the recall and cancellation was made a peremptory condition. This view does not arise from the evidence of extrinsic facts, but is a conclusion of law, for the Statutes at Large show that there was no law in existence in August, 1871, authorizing the issue of bonds for the erection of the hall or market, or any kindred purpose. And it is manifest that such was the view taken by the legislators; for, while they ordered the bonds of August, 1871, to be recalled, they, by Section 5 of the act, laid a tax sufficient to pay the interest on the new issue, "and all heretofore issued by authority of law." If the August, 1871, bonds had been regarded as issued by authority of law, they would have come within the provision of Section 5, and if not recalled and canceled, would have enjoyed its benefit. That, clearly, was not the intention.

The record of the points to which I express dissent is that, as is said, Section 6 of the act must be stripped of the idea that the proceeds of the bonds were a trust to build a city hall and market. I hold that, under Section 6, such proceeds do constitute a trust fund, to be applied in the manner prescribed in Section 6, and in no other.

"SECTION 6. That the said mayor and aldermen are hereby authorized and directed to apply the proceeds of the sale of said bonds, first, to the payment of any debts heretofore contracted, or which may hereafter be contracted, for the construction of the new city hall and the new market; and, secondly, for the improvement of the streets, the extension of the water works, and for any other improvements which shall be judged advisable by the said mayor and aldermen."

The ground that Section 6 constitutes no trust, is taken because the section does not, in terms, order the hall and market to

be built, the improvement of streets to be completed, and the water works to be extended, &c.; and because it does not explicitly declare that the bonds are issued for such purposes. What force, if any, such argument may have had, had the objects named in Section 6 never arisen, it loses all force the moment such objects come into existence. That debts for the hall and market had been contracted prior to the passage of the act, and large debts for the hall, subsequently, is shown by the evidence throughout the case, and, in fact, is admitted. Further, streets and water works were in existence when the act was passed, and their improvement and extension were clearly specific objects. But the direction to proceed with the city hall and market, which are treated by the act, (Sections 1 and 6), as then being in process of erection, is plainly impliable from the whole act. Indeed, the act differs in little from an ordinary deed of trust. Section 1 creates and vests the trust fund; Section 6 directs how it shall be applied. Each object named in Section 6 was then in being, or has arisen since. It is argued that this plain dedication of the fund does not specify and limit the objects to which the money shall be applied, because it names no object which was not already within the scope of the authority of the mayor and aldermen, and to which they might not have applied the surplus of the ordinary revenue of the city; and that the act, substantially, did nothing more than confer a power to increase the revenue for current purposes. The result would be that the mayor and aldermen could avail themselves of all the other portions of the act, but could cut off Section 6, and hold or spend the money at their sole discretion. I can see no difference between this act and a deed conveying to trustees, already exercising a trust over certain property, additional funds dedicated to the payment of specified debts already incurred and to be incurred in the improvement of the trust property, and then to certain specified, and then to general, improvements. Such a deed is never construed to give license to the trustees to disregard the instructions and spend the money at their pleasure, leaving to the *cestui que trust,* and to the donor, no remedy. There is no substantial difference, in principle, between this trust and that contained in the will of Stephen Girard. *Vidal* v. *Girard,* 2 *How.* 127. The city of Philadelphia, with

its own funds could, if it had seen proper, have executed many of the purposes named in that will, but it has never been for a moment contended that this gave it the right to disregard Girard's instructions. Like this act, it names several objects in successive order, the two latter of which are the maintenance of a police force and the "improvement of the city property and the general appearance of the city itself." But, as is held in *Vidal* v. *Girard, supra,* and *Girard* v. *Philadelphia,* 7 *Wall.* 1, the first object has the first claim upon the fund, and until that object has been accomplished the city has no power to devote the money to any other purpose. In the case before us, the very first and great object referred to throughout the act, is not near completion; heavy debts are outstanding, and yet the mass of the bonds have been wasted and misapplied. It is needless to argue the point further.

Reference to *Perry on Trusts,* § 704, will furnish ample authority to show that when a deed, devise or statute endows a corporation or its officers with funds, by direct gift or by power to levy a tax, such funds to be used for the improvement of the town in general terms, or for public water works or buildings, or works of any kind as enumerated in Section 6, such direction constitutes a specific express trust; the funds are held subject to the trust, and the trust can be enforced or protected by the court of equity. See, especially, *Attorney-General* v. *Eastlake; Attorney-General* v. *Dublin; Attorney-General* v. *Aspinall, supra.*

The third ground, to sustain which it is said that the object of the statute really was to enable the city to fund its floating debt, &c., giving merely a preference to certain classes of obligations, appears to me to be sufficiently refuted' by the act itself, and I have already, under the second division of my objections, said all that I have to say on that subject.

As a fourth ground, to sustain the conclusions reached by the court, it is said that the sole equity would consist in the statement that debts of the character provided for in the sixth section were outstanding at the time of the filing of the complaint; that the only debts of that class are debts on account of the city hall, and that as to them there is no equity, because such debts have an additional provision made for them by the tenth section of the

act, which directs that the income derived from lease of portions of the building shall be made a sinking fund for the payment of such debts. To answer the latter part first—that provision in Section 10 plainly either refers to the bonds devoted to the erection of the hall, or, more properly, is an additional security to the parties contracting to build the hall, for there is nothing in the act limiting the amount which might be expended on the hall. It is inconceivable that it was intended as a shield to cover the trustees in their breach of the trust imposed by Section 6, for such intention certainly is not expressed and ought not to be presumed.

To say that the equity of the case, or the right for relief, is limited to the debt now outstanding on the city hall, is a total disregard of the position occupied by a trustee, and of all the other objects mentioned in the act. It is a fixed rule that a trustee, and all parties dealing with him, with notice of the trust, are liable to account for the entire trust fund. Even if all the objects named in the act had been completed, and there remained a surplus of the proceeds of the bonds, the corporation had no right to devote it to purposes foreign to those named in the act, *Merchant Taylors Co.* v. *Attorney-General*, 11 *Eng. Ch. Cas.* 34, and could be held to account. Whether the act of such a trustee, if done in good faith and for a good purpose, could be confirmed by the court, or would need legislative confirmation, is a question which it is needless to discuss; but that one or the other would be necessary is very clear. If I understand the law, as laid down by the authorities, the plaintiff is entitled to relief against all misconduct of the corporate officers and parties dealing with them in the professed exercise of the powers contained in the act. I readily admit that the court should not go within the scope of the authority conferred, and interfere with its discharge, upon the ground that it is unwise or injurious to the public, but its plain duty is to *keep the corporate officers within* the scope of their authority, and when they go outside of it to treat them, and all dealing with them, exactly as it treats other parties committing or aiding in breaches of trust. " So long as those functionaries strictly confine themselves within the exercise of those powers which are confided to them by the law, this

court will not interfere. The court will not interfere to see whether any alteration or regulation which they may direct, is good or bad; but if they are departing from that power which the law has vested in them, if they are assuming to themselves a power over property, which the law does not give them, this court no longer considers them as acting under the authority of their commission, but treats them, whether they be a corporation or individuals, merely as persons dealing with property without legal authority." *Freeman* v. *Lewis*, 4 *Myl. & Cr.* 249.

The fifth point which compels dissent is the assumption by the court below, and sustained on appeal, that when the legislature directed that debts " heretofore contracted for the construction of the new city hall and market" should be paid out of the proceeds of the bonds, it meant that a certain note to J. L. Neagle, for $75,000, should be so paid. The note to Neagle is not mentioned in the act, and if the court goes outside of the act to extrinsic facts to ascertain the intention, it violates the settled rule of construction. The general assembly did not mean a debt to any particular person, nor any particular debt, for it did not say so; but it did mean debts of a specified class, viz., debts theretofore contracted for the construction of the hall and market. It devolves upon the court to decide what debts come within such description, and to do that the court properly resorts to evidence, and has no right to say that the legislature has preadjudicated the question of fact, unless that body has done so in explicit language. The evidence is conclusive that the note to J. L. Neagle for $75,000 did not, to that full extent, represent a debt under Section 6.

The note was given in August, 1871, for money loaned to the city council. The loan was negotiated under and by authority of proceedings of the board of mayor and aldermen, which, by law, are published; and it is admitted in the evidence " that the proceedings of council, referred to in the testimony in this case, were published in the newspapers of Columbia, S. C." The proceedings are as follows (July 11th, 1871, p. 99, minute-book of proceedings of city council of Columbia): " *Resolved*, That the mayor and committee of ways and means be authorized to borrow money from time to time, as may be necessary to carry

on contracts for building the proposed extension of the market, erecting new city hall, &c., and to secure any advances for this purpose, to dispose of and hypothecate city securities."

On August 17th, 1871, (minute-book, p. 213,) the following report was made by the committee of ways and means: "That in furtherance of the duty confided to them to raise money to build city hall and market, *and for other purposes necessary for support of city government,* they negotiated with various parties, and are able to borrow seventy-five thousand dollars ($75,000) at current bank rates, *which loan is to be secured by hypothecating two hundred and fifty thousand dollars'* ($250,000) *worth of city bonds.* This mode of raising money the committee regards as preferable to the sale of the large amount of bonds that would be required now to raise the money needed. The committee believe that there will be such an advance in city bonds, in a few months, as to enable council to sell bonds sufficient to liquidate the debt now created, without suffering the discount and great loss that the sale would now entail upon the city. *The committee would, therefore, recommend that the mayor, with the advice of the committee of ways and means, be authorized to execute a note of the city of Columbia for the* sum of seventy-five thousand dollars, and to secure the said note by a pledge of two hundred and fifty thousand dollars ($250,000) of city bonds, *which bonds he is hereby directed to issue."*

It is proven that under a resolution of the said city council, adopted on the said 17th day of August, 1871, (see p. 212 minute-book,) the report was adopted, and thus became a resolution of council. The date of the note, the sum and the security prove that the loan was obtained under the authority conferred by the latter resolution of August 17th, and not under the resolution of July 11th, 1871, as is said by the majority of the court. And the chairman of the committee of ways and means testifies that "upon the resolution of July 11th, 1871, we *negotiated* the loan with Dr. Neagle. *After the adoption* of the report made August 17th, we *closed the transaction."*

The testimony further shows, and it is admitted by both sides, that the proceeds of the note were disposed of by January 1st, 1872, prior to the passage of the act, as follows:

For city hall................. ......................$14,494 66
For market................................ ....... . 6,302 70

      Total................................ ...........$20,797 36

For the ordinary current expenses of the city government, having nothing to do with the hall or market, $53,917.08, leaving a balance of $285.56 unaccounted for.

It thus appears that the transaction was *not* completed under resolution of July 11th, which is construed to refer solely to hall and market; that the power to borrow money, conferred by that resolution, was *not* exercised, but that the committee came back and said that they might be able to borrow $75,000 for the hall and market and *other purposes necessary for the support of the city government,* but that for this loan securities were demanded which were not in their hands, and *recommended* that instead of their acting as under July 11th resolution, the power be confided in the *mayor,* under their advice, to give a *note of the city of Columbia;* to hypothecate as security for said note $250,000 in bonds, and to enable him to do the latter he be forthwith directed to *issue* the said bonds, which had thus to be brought into existence before they could be pledged. It is as plain as words can make it that the loan rests on the authority of the resolution adopted August 17th, 1871, and the resolution of July 11th has no more to do with the contract of loan and the note as perfected than if it had never existed. It was insufficient to support the scheme, and it was set aside, and one of far greater magnitude put in its place. The money was thus borrowed for several purposes, of which the hall and market were the two minor, and the sum necessary for the support of city government the major, as the testimony shows. It is useless to say that J. L. Neagle loaned under the resolution of August 11th, 1871. His own demand for $250,000 in bonds, which had not then been put in the committee's hands, shows that he was the very person who objected to the July 11th resolution, and required better and stronger note and security than that resolution authorized. He was satisfied with the resolution adopting the report on August 17th, 1871, because it was in full compliance with his requirements as therein set forth, and forthwith completed

the transaction on those very terms, of which he had full notice in the published resolution. He cannot now, with any merit, claim that he thought the loan was for the city hall, nor can his assignees, for the legislature did not make that the measure by which the object of the debt should be determined, but left it to be fixed by the ordinary rules of evidence. So much only as was paid for the hall and market is a debt contracted for their construction; the residue is a debt contracted for other purposes " necessary for the support of city government."

As to other points in the case, I concur in the following:

1. That the validity of the bonds is not impaired by the defective " abstract " of the act endorsed thereon.

2. That the failure to recall and cancel the $250,000 in bonds, referred to in Section 1, prior to the sale of the new bonds, does not, *per se*, invalidate the sale. No objection was made at the time the sales were made, and the bonds in question had been recalled and canceled before this action was brought. The plaintiff may be considered as bound by acquiescence, or with length of time having elapsed as estopped by laches. The failure to recall was a gross irregularity, but, no one having complained, the city was able afterwards to make amends by recalling the bonds, and thus, substantially, did comply with the results contemplated by the act. This view does not at all affect the right on the part of the plaintiff to object to the use of the proceeds of the sale of the new bonds to recall the old. The two questions are entirely disconnected—one is an irregularity which may be waived or repaired, the other is a plain breach of trust, and stands on a different footing.

3. That the bonds were advertised and put up at public sale substantially in compliance with the act (Section 3.) The first advertisement and sale was literally in compliance; the two subsequent, being on days fixed by public adjournment, were regarded as mere resumptions of the first sale. The public stood by, acquiescing to such construction, and it is too late now to complain.

I concur, therefore, so far as concerns the public conduct of the sales, but I differ widely from the view which is taken of the completion of these sales by subsequent negotiation. The

intention of Section 3 of the act was to secure the best market price, by attracting public attention, and to prevent fraudulent private negotiation. The evidence shows that this intention was fully carried out. The city council, to prevent sacrifice, limited the price at which the bonds should be allowed to go, and had large amounts thus bid off by its agents. But bidders at auction sales do not perfect their titles until they have complied with the terms. The city, which was both vendor and vendee, when it bid off the bonds by its agents, held them still subject to the same trusts as before, and the same limitations, with this exception, viz., that, having complied with the requirements of the act, intended to fix a fair market price, it was left to the discretion of the city officers whether they would put the bonds up again for public sale, or transfer the city bid to third parties at the same or an advanced price for the benefit of the city, subject to the purposes of the act.

The bonds were bid off at the three sales as follows :

| | |
|---|---|
| Clark Waring, for himself | $10,000 |
| R. K. Scott (per Donaldson) | 20,000 |
| Central National Bank (per Gambrill) | 10,000 |
| City of Columbia (per Alexander, Waring & Wilder,) | 210,000 |
| | $250,000 |

The question is whether the sales were perfected by payment, for, unless payment was made, (the sales being made in pursuance of a statutory trust, of which all had notice,) the title would not pass, and the bonds, in the hands of original purchasers, or persons having notice, are affected by the trust, and should be delivered up. To answer this inquiry it must first be fixed what, under the act, is a payment. The act, Section 1, empowers the mayor and aldermen " *to borrow money* by issuing city bonds," and directs that the issue be made by public sale. Section 3. One buying in the manner prescribed by the act, and paying money, is responsible for nothing which may occur in the future by reason of the conduct of the corporate officers, provided, always, that he is not *particeps*. Therefore, if the bonds had been sold for money, and the money paid, bondholders would not properly be parties to this action. The sole question would

2 D

be as to the application of the money, and in that only the corporation, its officers and parties dealing with them, could be concerned. But not $1 of money was paid for the $250,000 in bonds thus bid off, and the whole transaction is thereby opened to inquiry where the original parties are before the court. *Money* is the only payment technically admissible, because the express purpose of the issue is to " borrow money " by sale of the bonds. There may, nevertheless, be an equivalent for money. Debt, to the payment of which the money is dedicated by the act, is an equivalent. Section 6 defines such debt. A debt contracted for the construction of the hall and market was, from the first, an equivalent of money, and could be delivered up, satisfied, in payment for bonds. It matters not whether such debts were in the hands of original creditors, assignees or the city council, which had borrowed money to pay them, and remained liable for the amount. The proceeds of the bonds would be applicable thereto, and any obligation representing such debt could be taken as money. But an obligation for money previously borrowed by the city council, on the mere pretence that it was for a purpose, such as the act afterwards named, and not actually so applied, occupies no such position, and cannot be used in payment for bonds, for the council is a mere trustee under the act; the relators are the true parties in interest, are liable on the bonds, and should not be made to bear any burthen, or suffer any loss but such as results from the act, strictly construed. Therefore, in testing the validity of the sales, the payment for the bonds must be subjected to the rule thus laid down; it must be in money, or what, under Section 6, is its equivalent. The evidence shows, as already stated, that the city hall is not yet completed, and that debts contracted for its construction are still outstanding to a large amount. The city council has, therefore, up to this time, had no power to apply the proceeds of the bonds to any other purpose, ( *Vidal* v. *Girard, Girard* v. *Philadelphia, supra,*) and, consequently, no other class of indebtedness or obligation has been receivable in lieu of money.

I will now pass upon the sales in detail.

Clark Waring, who was then the contractor charged with the construction of the city hall, bid off $10,000 in bonds, and paid

for them by crediting the amount on the debt then due to him on city hall account. The payment was valid under Section 6, and those bonds are free from objection.

The Central National Bank bid off $10,000 in bonds, and for payment delivered up a note held against the city council and a small parcel of city coupons. The note was for money loaned to the council and expended for ordinary purposes, not included in Section 6. The payment was not good, and the bonds being in the hands of the original purchaser, should be delivered up, and the parties restored to their original position, leaving the bank to such remedy as in law it might have.

R. K. Scott bid off $20,000, and for payment entered a credit to the amount of his bid on a note he held against the city council for money previously loaned to aid in paying the $75,000 note held by J. L. Neagle. The credit was *prima facie* no payment, and the bonds should be delivered up; but another feature in the transaction will be subsequently noticed. The remaining $210,000 were in hands of the city officers, as vendors and bidders at the public sales, still subject to the conditions of the trust, and negotiable thereunder, but with the right, on the part of the council, to transfer their bids to purchasers on the terms and in the manner above laid down. The fact that the bonds were still in the hands of the city officers refutes the idea that purchasers from them can be regarded as holders of negotiable instruments, without notice. Possession by the city was notice that the bonds had not been issued, and none put up such defence except the Carolina National Bank. As to that defendant its own evidence and transactions conclude it by showing that it was intimately acquainted with the whole matter, and recognized the bonds as unissued and still the property of the city.

The city officers undertook to sell the bonds, as follows, to—

R. K. Scott....................................................... $50,000
Carolina National Bank............................... 100,000
John English....................................................... 3,500
Clark Waring....................................................... 4,500
John Alexander.................................................... 750
Union Savings Bank.......................................... 15,000
                                                                    ———
                                                                 $173,750

And pledged as collaterals—

| | |
|---|---:|
| South Carolina Bank and Trust Company | $29,250 |
| Thomas B. Jeter | 6,000 |
| Leaving in hand | 1,000 |

The sale to John English was *bona fide;* the money was paid, and the bonds are free from objection.

The sale to Waring was likewise unobjectionable. Valid payment was made by credit duly entered on his account for work done on the city hall.

The sale to John Alexander was void, for payment was made by credit on an account not within the objects named in the act. As to the rights of the subsequent holder, who has not answered, the court has disposed of them generally, and it is unnecessary to discuss the question in a mere dissent.

The second sale to R. K. Scott, is of the same character with the first, and should be set aside, except to the extent hereinafter indicated.

The sale to the Carolina National Bank is good in part, and, as to the residue, is of the same character, in part, with the sales to R. K. Scott, and in part is without any legal or equitable validity. The amount professedly given for the bonds was $66,000. It was paid by crediting on obligations held against the city council to the amount of $52,420.30, and by putting to the credit of the city $13,579.70. The latter was a valid payment, and to the extent that amount covers the bonds the sale is unobjectionable. Of the remaining $52,420.30, the amount, $35,513.25, represents money which the bank had loaned to aid in taking up the note to J. L. Neagle. R. K. Scott loaned $40,000, which was applied to the same object. Scott and the bank, therefore, represent any equity which was attached to Neagle's note. As already indicated, that note was to the extent of $20,797.36, entitled to be paid out of the proceeds of the sales of the bonds. The right to that sum, or rather to bonds which would represent that amount, is held by R. K. Scott and the bank in the proportion of $40,000 to $35,513.25, and in the additional proportion of the price at which they respectively bought the bonds. As to the balance of the bonds bought by Scott and by the bank, the sale should be set aside and the bonds

delivered up, and the parties restored to their respective rights as they stood at the time of the attempted sales, except in so far as the sales are confirmed by the rules above laid down.

The sale commonly called a sale to the Citizens' Bank of Petersburg, Va., was, in fact, a sale to the Union Savings Bank, as is shown by the testimony of the then mayor and treasurer, whatever may have been the intention in the mind of the purchaser, an agent, who represented both banks in the transaction. Parties dealing through agents are bound by the acts and by the knowledge on the part of their agents, within the scope of the authority. The testimony is that the sale was made to pay demands held by the Union Savings Bank as against the city. It makes no difference whether the agent paid by check on the Union Savings Bank, which he represented, and paid the check by crediting the amount on demands against the city, or paid down the money of the Citizens' Bank of Petersburg, Va., with one hand and took it up in the other, to satisfy the demands of the Union Savings Bank. In either course of conduct he colluded with the city council in the misappropriation of the proceeds of the bonds to debts not comprehended by the terms of the trust, and the law should fall, not upon the innocent relators, but upon the principal, who should be made to deliver up the bonds, and go for remedy against its agent and the Union Savings Bank.

The hypothecation of $29,250 of the bonds with the Carolina Bank and Trust Company was clearly illegal, and, in the hands of the original holder, the bonds could have been at once recalled ; but being negotiable in their character, and having passed into the hands of others by subsequent pledge, and then by public sale, and there being no evidence of notice, they have passed beyond the reach of the power of the court, and are valid obligations. There seem, however, to have been other bonds sold at the same time that were of the number delivered to R. K. Scott. They were pledged by his agent and were bid in by himself. As to these, no change was effected, and they are open to the original objection, and have been already disposed of. R. K. Scott was the owner of the pledge, and had notice of the defect in the title. It cannot be held that by pledging the bonds

and suffering them to be put up at public sale he could perfect his title by bidding them in, when he had full notice.

The hypothecation with Thomas B. Jeter to secure a loan, was without authority and ought to have been rescinded, and the bonds delivered up. It is alleged in the answer that they have been pledged in the Central National Bank, but there is no evidence that the pledge was made prior to the commencement of this proceeding.

The result of these views would be to reverse the judgment of the Circuit Court, and to order a decree confirming the sales of bonds to the amount of about $55,000 in bonds, and establishing the validity of the $29,250, which are made valid by their character of negotiability.

The power of the city council to borrow money and thus impose burthens on the city, is questioned in the case, but the court has not deemed it raised by the pleadings, and has not passed upon it. I am inclined to think the point does arise, but have already gone to such length that I am indisposed to say more than that very sound authorities seem disposed to lean against the exercise of such power by a corporation. The power to borrow money is distinct from the right to give certificates or evidence of indebtedness for services rendered, &c., and the case of *Neely* v. *Town of Yorkville*, 10 *S. C.* 141, by no means settles the former question.

Decree.